Juan GOMEZ, Plaintiff,

v.

Sabina KAPLAN—Hearing Officer, and Donald Selsky—Director of Special Housing Unit, Defendant.

No. 94 Civ. 3292(CSH).

United States District Court, S.D. New York.

May 19, 1997.

---

17. By contrast, no other county has adopted anything like the Rockland County Plan. See Plaintiffs' Trial Ex. 2.

Juan Gomez, Pro Se.

Dennis C. Vacco, Attorney General of the State of New York, New York City (Richard T. Mathieu, Assistant Attorney General, of counsel), for Defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

This is a civil rights action under 42 U.S.C. § 1983 in which the pro se plaintiff, an inmate of the New York State correctional system, alleges violations of his constitutional rights in connection with a disciplinary hearing. The defendants are the hearing officer and that officer's superior, who approved the hearing disposition adverse to plaintiff. The case is now before the Court on the parties' cross-motions for summary judgment.

### Background

The facts are not in dispute. On August 14, 1993, plaintiff Juan Gomez was an inmate at the Green Haven Correctional Facility, maintained by the New York State Department of Correctional Services (DOCS). On that date, an altercation broke out in the prison yard, during the course of which an inmate named Garcia was stabbed. The prison authorities charged Gomez with having stabbed Garcia. A hearing on that

charge began on August 22, 1993, before a hearing officer who is not a defendant in this action. That hearing officer found Gomez guilty of the charge on August 30, 1993. The proceedings were then reviewed by defendant Donald Selsky, DOCS' Director of the Office of Special Housing and Inmate Disciplinary Programs. Selsky had been designated "as the sole designee to hear prisoner's appeals of decisions rendered by DOCS disciplinary hearing officers in cases involving the most serious disciplinary offenses, so-called Tier III superintendent's hearings." *Young v. Selsky,* 41 F.3d 47, 49 (2d Cir.1994). On November 9, 1993, Selsky reversed the hearing officer's August 30, 1993 finding that Gomez had stabbed Garcia. Selsky based that reversal upon the following stated reason: "Failure to interview witness in inmate's presence and provide written reason for denial." Ex. E to plaintiff's Local Rule 3(g) statement.

The second hearing on this stabbing charge began on December 2, 1993 before defendant Sabina Kaplan [sued herein as "Sally Kaplan"], a Senior Corrections Counselor at the Green Haven facility. Her official responsibilities included conducting Tier III hearings of inmates charged with committing infractions of departmental prison rules and regulations.

In accordance with DOCS procedures, on November 11, 1993 plaintiff was provided with a list of facility employees who could assist him in a defense. Plaintiff then requested certain specific forms of assistance. I will discuss Gomez's requests in some detail. But first it is necessary to consider the nature of Gomez's defense to the charge that he stabbed Garcia.

That defense was based upon misidentification of the assailant and alibi. Gomez contended at the hearing that at the time Garcia was stabbed, which as noted occurred in the prison yard, Gomez was confined to his cell.

The record reflects that initially the prison authorities identified an inmate named Carabello as Garcia's assailant. However, the authorities dropped the charge against Carabello and charged Gomez with the stabbing after a prison officer, Lt. P. Czyz, interviewed a confidential informant, another inmate, who identified Gomez as the assailant.

In his pre-hearing assistance requests, Gomez asked that his assistant interview three inmates: Marino, Carabello (the inmate previously identified as the assailant), and Garcia (the stabbing victim). Gomez also requested that a nurse named Bedell, who treated Garcia's wounds after the stabbing, and the confidential informant be produced as witnesses at his hearing. Gomez also requested that his hearing assistant obtain certain information. That information included a document called the "B–Block go-round list." That is a list that prepared by a corrections officer in the evening in anticipation of each inmate's activities during the next day. Plaintiff contends that this list, if produced, would have shown that he was in his cell at the time of the yard incident in which Garcia was stabbed.

Kaplan convened the hearing on November 23, 1993. She advised Gomez that the "go-round" list would not be produced because under prison procedures these lists were not retained longer than seven days. Kaplan further advised Gomez that the name of the confidential informant would not be revealed; that Czyz had interviewed the confidential informant; and that Kaplan had interviewed Czyz on that subject and would reinterview him. On that score, Kaplan says in her affidavit on this motion at ¶ 9 fn. 2: "My reinterview of Lt. Czyz satisfied me that the informant was reliable and could identify plaintiff as the assailant."

Kaplan also advised Gomez that inmates Marino and Caraballo were willing to testify on his behalf, but that the testimony must be taken by speaker phone, since those inmates were then housed in facilities other than Green Haven. Kaplan further advised Gomez that efforts to obtain the testimony by speaker phone of nurse Bedell, who had left the institution, had proven unsuccessful. Lastly, Kaplan advised Gomez that Garcia, the stabbing victim, declined to testify at the hearing.

Following Kaplan's determination that Gomez was guilty of stabbing Garcia, Gomez appealed on the grounds that Kaplan should have personally interviewed the confidential

witness; that Kaplan should have obtained Bedell's testimony; that Kaplan should have had Garcia explain why he refused to testify; and that Gomez was wrongfully deprived of the "go-round list." Selsky, as reviewing officer, rejected all these contentions.

In this action, Gomez reasserts these criticisms, and contends that their effect was to deprive him of procedural due process rights. The parties now cross-move for summary judgment.

## Discussion

Defendants argue that the facts do not make out a constitutional violation. In the alternative, they rely upon the doctrine of qualified immunity.

Among other authorities defendants cite *Richardson v. Selsky*, 5 F.3d 616 (2d Cir. 1993), during the course of their argument that "[t]here is no requirement that a hearing officer personally interview a confidential informant; his information may be relayed by a guard or other investigator." Defendant's brief at 12. *Richardson* is said to stand for the related proposition that "[a]ll that is required is there be some evidence in the record of the informant's reliability." *Id.* at 13.

Defendants' reliance upon *Richardson* is puzzling because the case furnishes considerable support to plaintiff at bar.

*Richardson v. Selsky* closely resembles the case at bar on its facts, quite apart from the fact that Donald Selsky is a defendant in both cases. The § 1983 plaintiff in *Richardson*, a DOCS inmate at the Green Haven facility, was charged with stabbing another inmate in a prison yard. Richardson denied that he was the inmate who stabbed the victim, one Caroline. The disciplinary hearing resulting in Richardson's conviction on the charge took place in March 1985. Deputy superintendent Capuano was the hearing officer. A prison officer, Lt. Fenton, advised the hearing officer that confidential informants had identified Richardson as the assailant. The Second Circuit's account of this aspect of the case appears at 5 F.3d at 618:

Capuano interviewed Lieutenant Fenton in Richardson's presence. Fenton stated that he had received information from "some sources that I know who they are and I'd rather not tell and there are some sources that I do not know who they are because they did not identify themselves." All of these sources, he stated, identified Richardson as the person who stabbed Caroline. With regard to the confidential sources, Fenton asserts that they had "proven reliable," that in his previous dealings with them he had had "positive results," and that he was "certain that the information [he] had received [was] accurate." Fenton said that according to the confidential sources, Richardson had retaliated against Caroline for refusing to be a witness on his behalf in a separate proceeding. Capuano directed that Richardson be escorted from the hearing room whereupon Capuano interviewed Fenton outside of Richardson's presence.

The hearing officer did not personally interview the confidential informants. Following his conviction on the charge Richardson received a sentence comparable to that imposed upon the plaintiff at bar. Richardson thereafter commenced an Article 78 proceeding in New York Supreme Court, Dutchess County. That court entered an opinion dated August 15, 1985 which stated:

"The hearing officer had no independent basis for making any evaluation of the credibility of Lt. Fenton's 'confidential informants,' since he did not communicate with any of them. He improperly relied upon Lt. Fenton's unsupported conclusory opinions and hearsay statements concerning their reliability and credibility."
5 F.3d at 618–19.

The state court ordered the vacatur of the hearing officer's disposition and the expungement of the matter from Richardson's record. *Id.*

Richardson then began his § 1983 action against the prison officials involved, including Selsky, who in his capacity as DOCS reviewing officer had upheld the conviction and the penalty. A principal contention by Richardson was that the failure of Capuano, as hearing officer, to make an independent assessment of the reliability of the confidential informants deprived him of his due process

rights. This court, in an opinion by the late Judge Broderick affirming a report and recommendation by Magistrate Judge Grubin, held that Richardson had suffered no constitutional deprivation.

The Second Circuit affirmed the result below, in an opinion dated September 22, 1993, but significantly on the basis of the defendants' qualified immunity. The district court had not considered that issue, but as the Second Circuit observed at 5 F.3d at 621, "we may affirm on any basis supported by the record, including grounds upon which the district court did not rely." In affirming on that ground, the court of appeals used language that I find instructive in the case at bar. The court of appeals said at 5 F.3d at 621:

> We affirm the district court's grant of summary judgment on the ground of qualified immunity, though we note that if the circumstances of this case had occurred on a more recent date, the result herein might well have been different.

 The decisive question on the qualified immunity issue, as it is in all such cases involving the qualified immunity of public officials, is the state of the law at the time of defendants' conduct. "Public officials are entitled to qualified immunity from liability for civil damages so long as their conduct does not violate a clearly established statutory or constitutional right. Public officials receive this protection upon establishing that it was objectively reasonable for them to believe that their acts did not violate clearly established rights." *Richardson*, 5 F.3d at 621 (citations omitted).

Those principles required the court of appeals to assess in *Richardson* whether, in March 1985, the cases clearly established that an inmate facing disciplinary charges had a constitutional due process right to require a disciplinary hearing officer to make an independent assessment of the reliability of a confidential informant before relying on evidence from the informant. The plaintiff in *Richardson* lost his case because, after an extensive review of authority, the Second Circuit said at 5 F.3d at 623:

> We conclude that Richardson has not established that it was clear in this Circuit as

of March 1985 that he had a right to have the presiding officer at the disciplinary hearing independently examine the credibility of the confidential informants.

But I think it fair to say that the Second Circuit found it a close question. While in March 1985 neither the Supreme Court nor the Second Circuit had squarely confronted the issue, other circuits had held that in such situations a hearing officer must make an independent assessment of the credibility of confidential informants and the reliability of their information. *See, e.g., Helms v. Hewitt*, 655 F.2d 487, 503 (3d Cir.1981), *rev'd on other grounds*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Kyle v. Hanberry*, 677 F.2d 1386, 1392 (11th Cir.1982) (requiring prison disciplinary committee to establish informant's reliability and to create record that so demonstrates). And the Second Circuit in *Richardson* observed that in its earlier decision, *Zavaro v. Coughlin*, 970 F.2d 1148 (2d Cir.1992), "this Court clearly implied that prison officials should independently assess an informant's reliability if they relied upon that information in a disciplinary hearing." 5 F.3d at 622.

The Second Circuit concluded its opinion in *Richardson* by saying this:

> Prison officials are charged with knowledge of relevant decisional law, especially the decisions of the circuit in which they perform their official duties.

In recent months, this Court has considered—but only today addressed—whether the law within this Circuit is clearly established that prisoners have a right to an independent examination of the credibility of confidential informants. As of March 1985, the law was not so clearly established. However, as *Zavaro* implied, there must be some evidence in the record of the informant's reliability. One means of satisfying this standard is for prison officials contemporaneously and independently to assess the credibility of the informants, and to create and preserve a record of that assessment. Such a record should be available for administrative or judicial review to insure that the conclusion reached

by the prison disciplinary officials satisfies due process.

5 F.3d at 624 (citations and internal quotation marks omitted).

As noted, the court of appeals delivered its opinion in *Richardson* on September 22, 1993. Gomez's disciplinary hearing presided over by defendant Kaplan began in November 1993.

I conclude that after September 22, 1993, the date on which the Second Circuit decided *Richardson v. Selsky,* the clearly established law in this Circuit required prison disciplinary hearing officers to make an independent assessment of the reliability of confidential informants, and to create and preserve a record of that assessment. And there was a particular reason for the defendants at bar to be aware of that law. *Richardson* involved a disciplinary hearing at the same prison facility, which was reviewed by the same supervisory official.

In her affidavit, hearing officer Kaplan says at ¶ 8: "I informed plaintiff, that as per DOCS rules, I could not personally interview the informant unless the informant consented to testify at the hearing." Kaplan gave Gomez this advice on November 23, 1993, over two months after *Richardson* had been decided. How DOCS could have been operating under such a rule in the wake of *Richardson* is unfathomable. This purported rule is not explicated further in the defendants' briefs.

■ On the basis of the Second Circuit's decision in *Richardson v. Selsky* and the timing of that decision, I hold in the case at bar that Kaplan's failure to make an independent assessment of the reliability of the confidential informant violated Gomez's constitutional right to due process; and neither Kaplan nor Selsky may invoke the protection of qualified immunity with respect to the violation.[1]

I recognize that there is other evidence in the record upon which Kaplan relied in finding Gomez guilty of the charge. Kaplan summarized the reasons for her decision in ¶ 16 of her affidavit:

> Based on Lt. Czyz's testimony obtained from the confidential informant; Lt. Czyz's testimony in plaintiff's presence; Officer Russell's testimony, that he discussed seeing plaintiff in the yard with Lt. Czyz immediately following the incident; Officer Russell's testimony that the cells were not dead bolted at the time of the incident as plaintiff stated they were; Officer Russell's testimony that plaintiff rather than being in his cell, was in the exercise yard; and plaintiff's witnesses' failure to confirm that plaintiff was in his cell, I found plaintiff guilty of violating rule 100.10 (Assault on Inmate) and 1.00 of the penal law.

■ I do not think that these other sources of evidence are sufficient, separately or in combination, to insulate the defendants from the consequences of a constitutional violation. The testimony of officer Russell places Gomez in the yard, rather than in his cell as Gomez testified, but falls short of identifying Gomez as the inmate who assaulted Garcia. In any event, I read *Richardson* and the cases in other circuits that preceded that case as holding that an actionable constitutional violation occurs if a hearing officer relies to any degree upon the evidence of a confidential informant without having independently assessed its reliability. It is also noteworthy that when Kaplan summarized her reasons for finding Gomez guilty, the first evidence to which she referred was "Lt. Czyz's testimony obtained from the confidential informant."

For these reasons, plaintiff's motion for summary judgment on the issue of liability is granted. Defendants' cross-motion for summary judgment is denied.[2]

---

1. Subsequent to the decision in *Richardson v. Selsky,* Selsky sought to convince the court of appeals that he had absolute immunity because of his quasi-judicial responsibilities. In *Young v. Selsky,* 41 F.3d 47, 54 (2d Cir.1994), the Second Circuit held that "the scale tips against [Selsky's] claim of absolute immunity," primarily because of "the lack of a sufficient guaranty of [Selsky's] independence and insulation from communication with hearing officers about specific cases."

2. Although in the view I take of the case I need not consider plaintiff's other claims of constitutional violation, they are in any event lacking in merit. Plaintiff's claims that hearing officer Kaplan should have procured Bedell's testimony,

836

A jury trial on damages issues only will be held in accordance with subsequent scheduling orders.

It is SO ORDERED.

required Garcia, the stabbing victim to explain why he refused to testify, and ensured the production of the "B–Block go-round list," are all based on the proposition that the defendants failed to preserve or produce evidence that might exculpate plaintiff. But the Supreme Court has held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988). I apply that principle in the case at bar. Nothing in the record supports an inference that the defendants acted in bad faith in this regard. Kaplan made reasonable efforts to secure the testimony of nurse Bedell. Plaintiff had no constitutional right in obtaining the stabbing victim's explanation of why he would not testify. Plaintiff does not dispute defendants' statement that the daily entries in the "go-round book" are destroyed after seven days' time. If failure to preserve the sheet for the day in question constituted a procedural error, which I do not find, the fault was that of the initial hearing officer, not a defendant in the case, rather than Kaplan.